Filed 10/27/25

VERMONT SUPERIOR COURT

Caledonia Unit
1126 Main Street Suite 1
St. Johnsbury VT 05819
802-748-6600
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 23-CV-01770

| Peter Zaun et al v. John Christman |
| --- |

## FINDINGS, CONCLUSIONS, AND ORDER

In this case, plaintiffs Peter and Dorene Zaun have brought a claim against defendant John Christman arising from John's allegedly defective work on a renovation project at plaintiffs' residence in West Burke. Plaintiffs seek damages for the cost to repair and complete the work, as well as attorney's fees. Following a site visit, the case came before the court for a two-day bench trial on June 17 and 18, 2025, after which the parties submitted post-hearing memoranda. For the reasons set forth below, the court will enter judgment for plaintiffs for $62,745. Plaintiffs' request for attorney's fees is denied.

### Findings of Fact

Plaintiffs have a "double-wide" home on property they own located at 822 Old Farm Road in West Burke. John is a contractor doing business as John Christman Construction, out of North Concord. In late 2020 or early 2021, plaintiffs contacted John to discuss a substantial renovation project for their home. Plaintiffs wanted to renovate their existing space and build an addition to add bedrooms for four grandchildren plaintiffs had recently adopted.

On or about January 11, 2021, John submitted a "work proposal" for the project, which entailed adding a two-car garage, an expanded living area above the garage with the additional bedrooms, an enlarged kitchen, and an expanded porch. The initial proposal quoted a price of $146,500. The proposal was never signed by the parties. The parties agreed John would perform the work and plaintiffs paid John a $15,000 down payment in March 2021.

Before the work began, the parties agreed to expand the scope of the project to include removing and replacing the roof on the existing structure so that the entire living room and kitchen area would be covered by a new vaulted timber-frame ceiling. The parties also agreed that the interior walls of the home would be finished using shiplap.

Peter, who is a logger, insisted on using lumber that he cut for the timber framing on the project, which he supplied to the job site. The lumber was sawed from trees cut the previous year. Plaintiffs had no significant construction experience and relied on John to perform the work in a professional manner.

After some delays, plaintiffs paid John a further deposit of $60,000 in late September 2021, and John began work on the project several weeks later. Work continued with some stops

and starts through December 2022. Although both parties contributed to the delays, a primary source of delay was plaintiffs' need to sell a property that Peter had inherited so they could use the proceeds to pay John. Plaintiffs lived in the home while the project was underway.

In advance of and continuing through John's work on the project, John communicated primarily and extensively with Dorene through Facebook Messenger. Additional details about the project were discussed in these communications.

By November 2021, the parties had agreed that the anticipated cost of the project had increased to $175,000, but John indicated that amount would not include any work in the basement or renovating the existing bedrooms and bathroom.

On November 26, 2021, Dorene indicated that after the $175,000 was paid, she would "need a number" from John in order "to go to the bank" and get the money to "finish the whole house." Def.'s Exh. A at 85. Approximately a month later, shortly after Christmas, Dorene confirmed with John that Peter was willing to spend money from his inheritance on the project and that plaintiffs wanted to finish the whole house. Around this time, Dorene also confirmed that plaintiffs wanted to install a large picture window facing Burke Mountain.

Plaintiffs paid John $50,000 in November 2021 and an additional $50,000 in January 2022, which brough the total amount paid John to $175,000. John told Dorene this would likely be enough money to keep him working on the project through April.

In or about March 2021, John built beds for plaintiffs' grandchildren in the new addition at no additional charge. In May, Peter sawed out and delivered additional timber for the project.

Although there was no formal agreement, the parties discussed in early 2022 that the cost to complete the project would be an additional $80,000 above the $175,000 already paid. Plaintiffs paid John and additional $20,000 or about May 22, and approximately one month later, John wrote to Dorene, "So you were at $80,000 and you gave me 20k so you are at $60k and yes I could use some more please?" Def.'s Exh. A. at 48. Plaintiffs paid John an additional $10,000 at the end of June 2022. Dorene noted that was all plaintiffs could afford at that time as they were still waiting to receive Peter's inheritance.[1]

Work on the project continued through the summer of 2022. In July, while the roof was under construction and tarped, water came into the house during a storm. John promptly addressed the issue. During this period John regularly checked in to see of Dorene was satisfied with the project, and Dorene consistently expressed satisfaction with the work being done.

Things changed in September. The roof was not yet completed and was continuing to leak, causing mold and water damage on the interior of the house. Plaintiffs' concerns began to mount.

On September 29, 2022, Dorene reached out to John and requested a meeting to discuss completing the job, along with an accounting or itemization of the remaining $50,000 that the

---

[1] Plaintiffs' payment summary indicates an additional $10,000 payment was made to John on August 15, 2022, but the circumstances of that payment are not clear from the record.

parties had previously discussed as being needed to complete the job. Dorene followed up on October 2 and raised additional concerns relating to the progress of the job, the motivation of John's workers, and approaching winter without the roof being completed. Dorene reached out to John again on October 18, stating that the project needed to be completed as soon as possible and accused him of avoiding her.

John continued to work on the project for the next several weeks, but then stopped, apparently because plaintiffs had not paid him. On November 13, Dorene wrote John that she thought Peter would be receiving his inheritance shortly and stated that she really wanted John to "finish trim in house, doors and siding," and that if John gave her "a work schedule," she would "get the money." Def.'s Exh. A at 9. John said he agreed and had "figured once the closing was done and you guys had the money then I jump right back on it." *Id.* at 8.

On November 18, Dorene reached back out complaining about four windows John installed that were not locking or shutting completely and noted that it was getting too cold to install vinyl siding outside before winter, but that plaintiffs still wanted John to complete other work on the project, including inside trim and electrical work. She asked John how much money he needed to come back to work, and he responded that he "would like to get half of the 50k and then we can finish the siding in the spring." *Id.* at 7. Plaintiffs paid John an additional $20,000 on or about November 25, 2022.

After some delays related to COVID concerns, John and his crew completed the roof, and performed some electrical and other interior work, before stopping work for the winter in December 2023. John did not install the exterior siding, although he covered the plywood in membrane and taped the seams to protect from the weather. Plaintiffs made a final payment to John for $10,000 in January 2023. In addition to the siding, John expected to create a "punch list" of items to address before completing work on the project.

After John and his crew left for the winter, plaintiffs developed significant concerns about the work that had been performed. The joints on the timber framing that John installed (from lumber that Peter cut and supplied) were not flush. John and his crew cut the timbers with a chainsaw rather than a circular or miter saw, and the resulting cuts were rougher than plaintiffs expected. Moreover, as the timber framing dried out further after being installed, it began to twist and separate at the joints. The ridgeline in the roof that John installed had a visible sag or belly in it. The flooring was beginning to separate in several places. Some interior doors were not plum and did not close properly. Additionally, John's efforts to weatherproof the property for the winter did not prevent the property from sustaining some water damage around the windows and roof during the winter months.

Because of these concerns, in or about March 2023, plaintiffs retained building inspector John Calamaio of C3 Property Inspections to inspect the home. The resulting inspection report confirmed plaintiffs' concerns about the work that John had done (and also identified other aspects of the home that needed attention).

When John reached out in April 2023 to discuss completing the project and installing the exterior siding, plaintiffs did not respond.

After receiving the inspection report, plaintiffs hired Matt Schartner, another contractor, to finish the renovation project. Matt installed the exterior siding, addressed a leak around a new stove installed in the kitchen, and added some gusset plates to the timber framing to prevent the joints from further separating. Matt billed plaintiffs approximately $83,000 for the work he performed but later significantly discounted the bill. The siding work alone accounted for approximately $20,000 of the initial bill.[2]

Plaintiff filed the complaint in this case on April 25, 2023. At trial, plaintiffs presented expert testimony from Stowe builder Tim Meehan, who visited plaintiffs' property in October 2023, and provided plaintiffs with a repair estimate in December 2024. Tim testified that the roof construction was substandard and should be replaced. He noted the "belly" in the roofline, which was an aesthetic concern and could potentially pose structural issues down the road. He noted that the soffit work on the roof was unfinished, and that the drip edge was not properly installed. He further testified that the chainsaw-cut timber rafters looked unprofessional, that he would not have used a chainsaw to make those cuts, and that several interior doors were out of plumb. Tim also noted concerns with the flooring coming up. He testified that the exterior of the home should have been fully buttoned up before construction focused on the interior. Tim did not believe that John had a done an adequate job wrapping the house exterior and flashing the windows before leaving the job for the winter. He recommended replacing the entire roof; shimming the interior rafters to make the joints flush; removing, reflashing, and reinstalling the windows; and repairing the flooring. Tim estimated the total cost for this work was $146,015.

## Conclusions of Law

Plaintiffs claim John's work was defective and seek a damages award in the amount of $146,015, corresponding with Tim Meehan's estimate for the cost to repair the work, along with an award of attorney's fees.

Through their communications, the parties reached an agreement or contract that governed the terms of the construction work that John performed, although the parties dispute some of the terms of that agreement. The court concludes the parties ultimately agreed on a fixed-price contract (as opposed to a time-and-materials contract) for the renovation of plaintiffs' home. The agreement was modified several times on account of the scope of work and the timeline for completion being enlarged. The record is not entirely clear with respect to the exact amounts paid to John for the project. Plaintiffs' payment summary indicates a total of approximately $255,000 having been paid to John but includes entries for an unexplained August 2022 payment of $10,000 and separate entries for repayment of an unexplained $10,000 loan that John had apparently made to plaintiffs in the latter half of 2022. Regardless, the evidence

---

[2] Plaintiffs later filed a small claims complaint against Matt based on some of the siding he installed having fallen off the house. The case was settled out of court.

establishes that by November 2022, the parties had agreed that plaintiffs would pay John an additional $50,000 to complete the project, which would entail installing the exterior siding and completing a punch-list of interior finishing work and any necessary repairs to the work already performed. Payments totaling $30,000 were made toward that outstanding balance on November 22, 2022 ($20,000), and January 3, 2022 ($10,000), following John's work in November and December, leaving $20,000 outstanding when plaintiffs unilaterally terminated the contract the following spring.

In construction disputes like this one, "[t]he measure of damages depends upon which party breached the contract." *The v. Kenneth & Elisabeth Felten*, No. 737-10-08 Wrcv, 2009 WL 6356593 (Vt. Super. Jan. 16, 2009) (Eaton, J.) (quoting *VanVelsor v. Dzewaltowski,* 136 Vt. 103, 105-06 (1978)). If the homeowner breached the contract by demanding that work stop, "the contractor is entitled to recover the contract price less his cost to perform the remainder of the contract." *Id.* But "if the contractor breaches the contract by defective construction," the homeowner's demand is justified and the homeowner can recover "damages measured by the reasonable cost of reconstruction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste." *Id.* Alternately, damages can be measured by the lost value to the property caused by the defective construction, if that is capable of measurement. *Birchwood Land Co. v. Ormond Bushey & Sons, Inc.*, 2013 VT 60, ¶ 13, 194 Vt. 478 (citations omitted).

Based on the evidence presented—most notably, the photographs of the work performed and the testimony of plaintiffs' expert Tim Meehan—the court concludes that John breached the contract by "defective" or substandard construction in several respects. Although much of the work John performed was done competently, several aspects of the project were not done in a "good and workmanlike manner" insofar as they were not done in conformity with prevailing standards for professional home renovation and construction projects in Vermont. *See, e.g.*, *Whittemore v. Valway*, No. 118-6-02 Lecv, 2003 WL 25648126 (Vt. Super. Nov. 18, 2003) (citing *Rothberg v. Olenik,* 128 Vt. 295, 299 (1970)). Specifically, (i) the roofline of the new roof is visibly bowed; (ii) the timber framing on the vaulted ceiling was cut unprofessionally with a chainsaw and installed before it had sufficiently dried, resulting in noticeable warping and separation at the joints[3]; (iii) the front interior wall near the main entrance is not plumb; (iv) the new flooring has started to separate; and (iv) the exterior walls and roof were not sufficiently finished or weatherproofed to prevent water damage after John left the job during the winter of 2022-2023.

Plaintiffs were accordingly justified in terminating their contract with John and are entitled to recover damages. Because scant evidence was admitted comparing the value of

---

[3] Although Peter supplied the lumber and insisted that it be used, it was John's responsibility as the general contractor to exercise reasonable care in completing his work on the project, either by waiting until the lumber had sufficiently dried before it was installed or informing plaintiffs of the risks associated with not doing so. *Cf. Lamell Lumber Corp. v. Newstress Int'l, Inc.*, 2007 VT 83, ¶ 16, 182 Vt. 282 (recognizing tort claim based on contractor's failure to exercise reasonable care in design and construction of project, including with respect to materials used (citation omitted)).

plaintiffs' home had all of John's work been completed competently to the home's actual value when John stopped work, the court will award damages based on the reasonable cost to complete and repair the areas where John's work was substandard.

The damages plaintiffs can recover are limited to the reasonable repair costs of the substandard work that John performed. In other words, plaintiffs are not entitled to recover from John the cost of installing the exterior siding and completing various "punch list" tasks that John did not complete, as the court concludes that John was not allowed to perform that work and was not paid for that work.

Excluding the cost of materials for repairing the exterior siding, Tim Meehan estimated repair costs of $128,265. That number, however, includes a bulk labor cost of $97,920, representing 1,440 hours of work at $68 per hour to perform the needed repair work, including items for which the court concludes John is not liable such as repairing the exterior siding. In the absence of any itemization in the estimate for the labor costs, the court concludes that 75%, or 1,080 hours of the estimated repair work can reasonably be attributed to the work that John deficiently performed (as opposed the work he was not allowed to perform when plaintiffs terminated the contract). The court further concludes that Tim's $68 per hour rate is significantly higher than average rate for construction work in Caledonia County, which is closer to $30 per hour.[4] Applying that rate, the court concludes the appropriate labor cost is $32,400, and that the total reasonable repair cost is $62,745. The court will award plaintiffs damages in this amount.

Plaintiffs also request an award of attorney's fees. "The American Rule ordinarily prohibits an award of attorney's fees absent a specific statutory provision or an agreement of the parties." *Fletcher Hill, Inc. v. Crosbie*, 2005 VT 1, ¶ 5, 178 Vt. 77. The parties here did not reach an agreement with respect to attorney's fees. Plaintiffs cite the Consumer Protection Act (formerly known as the Consumer Fraud Act), 9 V.S.A. § 2451 et seq., in support of their fee request but have not pled or proven any claim under that statute. Plaintiffs also rely on the Prompt Pay Act, which provides that "the substantially prevailing party in any proceeding to recover any payment within the scope of this chapter shall be awarded reasonable attorney's fees in an amount to be determined by the court or arbitrator, together with expenses." 9 V.S.A. § 4007. But this provision does not apply here because neither party here sued to recover unpaid invoices under the Prompt Pay Act. To the contrary, plaintiffs sued—and are awarded damages— for breach of contract based on defective construction. Because the court concludes that Section

---

[4] For example, the evidence shows that John was estimating his labor costs at approximately $600 per day for 2-3 employees to work at plaintiffs' home, which plaintiffs complained at the time was unreasonably high. Assuming an 8-hour day, this roughly aligns with the prevailing rates for carpentry and roofing work in Northern Vermont according to the most recent statistics from the Vermont Department of Labor, of which the court takes judicial notice. *See* V.R.E. 201; Vt. Dep't of Labor, Vt. Constr. Prevailing Wage Rate Schedule (2025), *available at* https://www.vtlmi.info/wageincome.cfm (last visited Oct. 24, 2025) (indicating an approximately $30 per hour rate for carpenters, an approximately $25 per hour rate for roofers, and an approximately $20 per hour rate for helpers). The court applies a $30 per hour rate in its damages calculation, rather than an average of the applicable rates, to factor in general overhead costs.

4007 does not apply in this situation, the America Rule applies, and plaintiffs' request for attorney's fees is denied.

## Order

The court will enter judgment for plaintiffs in the amount of $62,745.

Electronically signed on: 10/26/2025 pursuant to V.R.E.F. 9(d)

_____
Benjamin D. Battles
Superior Court Judge

Electronically signed pursuant to V.R.E.F. 9(d)

_____
Merle L. Haskins
Assistant Judge